GREEN LEAF VENTURES, INC. (FORMERLY PARAGON RESTAURANT GROUP, INC., FORMERLY VICORP SPECIALTY RESTAURANTS, INC.) AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Green Leaf Ventures v. Commissioner
Docket No. 12050-93
United States Tax Court
T.C. Memo 1995-155; 1995 Tax Ct. Memo LEXIS 149; 69 T.C.M. (CCH) 2342; April 6, 1995, Filed *149 Decision will be entered under Rule 155. For petitioners: W. Alan Lautanen, Louis B. Edleson, and Kimberly S. Stanley. For respondent: Karen Nicholson Sommers and Roberta A. Duffy PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioners' Federal income tax in the amount of $ 2,516,103 for the section 338 deemed sale return for an acquisition that occurred on October 27, 1986. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the relevant years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, [1] *150 the issue remaining for decision is whether Green Leaf Ventures, Inc., is entitled to an interest expense deduction in the amount of $ 5,685,136 with respect to a purported debt owed to its former parent corporation. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Green Leaf Ventures, Inc. (petitioner or Green Leaf) was incorporated under the name of Continental Restaurant Systems, Inc., in the State of Colorado on December 22, 1983. The name of Continental Restaurant Systems, Inc., was changed to VICORP Specialty Restaurants, Inc. (VSR) on December 28, 1983, and remained so at all times relevant to this case. [3] The stated business purpose of Green Leaf and its predecessors is to own, conduct, operate, maintain, and carry on the business of restaurants and food service. Green Leaf's principal place of business at all times *151 relevant to this case and at the time the petition was filed was San Diego, California. From the time of its incorporation through October 26, 1986, Green Leaf or VSR as it was then known was a wholly owned subsidiary of VICORP Restaurants, Inc. (VICORP) and was a member of an affiliated group within the meaning of section 1504(a). [4]VICORP was a publicly held corporation and its headquarters was located in Denver, Colorado. Both VICORP and VSR operated on a fiscal year ending the last Sunday of October, and both used the accrual method of accounting. VICORP filed Federal income tax returns on a consolidated basis with its subsidiaries, including VSR. *152 During 1983 and 1984, VICORP became one of the largest, most profitable, and fastest-growing corporate owners of restaurants in the United States. VICORP spent in excess of $ 150 million during 1983 and 1984 to acquire approximately 270 restaurants, thereby doubling in size. By the end of 1984, VICORP, either directly or through its subsidiaries, owned 523 restaurants, including the Village Inn Pancake House chain, the Poppin Fresh Pie chain (later renamed Bakers Square), and the Sambo's chain, among others. To finance these acquisitions, VICORP incurred substantial debt to banks and other lenders. As part of this expansion, on or about December 30, 1983, VICORP agreed to purchase 71 dinnerhouse restaurants and related assets from Foodmaker, Inc. (Foodmaker) a wholly owned subsidiary of Ralston Purina Company. A consortium of unrelated banks and other lenders (outside lenders) [5] agreed to lend VICORP up to $ 65 million, specifically earmarking $ 55 million for this Foodmaker purchase. *153 Before agreeing to the loan, officers of the lead lender, Continental Illinois National Bank and Trust Company of Chicago (Continental Bank), examined the operating revenues and expenses of the Foodmaker restaurants, both from an historical perspective and as to projections of future operations. While owned by Foodmaker, the restaurants generated net positive cash flows of $ 10.6 million in fiscal year 1982 and $ 17.4 million in fiscal year 1983. Continental Bank officers projected that VICORP would have a positive net cash flow from the operation of the Foodmaker restaurants even if the entire purchase price were financed with debt. The Continental Bank officers concluded that, assuming the entire purchase price of the restaurants were financed with $ 55 million in debt, bearing interest at 13.5 percent per annum, VICORP would still have sufficient positive cash flow from the operations to meet the debt service on the acquisition financing. Thus, they further concluded that, although VICORP had a lot of debt, the lending risk was manageable and that the investment was "a good one" for VICORP. VICORP entered into a credit agreement, dated as of February 10, 1984 (the Credit *154 Agreement) with the lenders' consortium. In the Credit Agreement, the outside lenders specifically committed up to $ 55 million of the total loan amount for the purchase of the Foodmaker assets (the B Term Loan). The Credit Agreement also provided that VICORP could request an $ 8 million standby letter of credit to be deposited with the seller of the Foodmaker assets as security against default by VICORP in discharging certain Foodmaker industrial revenue bonds and lease obligations assumed by VICORP. The Credit Agreement stated that VICORP would incorporate a subsidiary, VSR, to purchase the Foodmaker assets. The outside lenders would not lend money directly to VSR. [6] *156 The Credit Agreement stated that VICORP would lend to VSR as much as $ 55 million of the amount borrowed from the lenders so that VSR could purchase the Foodmaker assets. [7] As security, VICORP executed a pledge agreement granting the outside lenders a lien on and a security interest in 100 percent of the stock of VSR. In addition, the lenders required VICORP to grant a lien on any or all of VICORP's or any of its subsidiaries' underlying assets if VICORP did not sell equity or debt securities yielding at least *155 $ 25 million by July 31, 1985. The outside lenders specifically conditioned the making of the B Term Loan on the purchase of the Foodmaker restaurants in the manner contemplated by the Agreement of Sale. [8]VICORP never objected to the terms of the Credit Agreement nor did it try to negotiate other terms. *157 VICORP formed VSR as a wholly owned subsidiary, with the stated business purpose to "own, conduct, operate, maintain and carry on the business of restaurants and food services". VSR issued to VICORP 1,000 shares of VSR common stock, par value $ .01, for the sum of $ 1,010 (or $ 1.01 per share). On December 27, 1983, VSR's board of directors held its first meeting. The initial board members were Gordon H. Miles (Miles), chairman of the board of directors of VICORP, Charles R. Frederickson (Frederickson), president of VICORP, and Peter F. Doane (Doane), executive vice president and chief financial officer of VICORP, and they were elected to continue as directors until the next annual meeting of shareholders or until successors were elected. Miles was elected chairman of the board and Doane as secretary. The following persons were nominated and elected as officers of VSR: Charles R. Frederickson
President
Thomas W. Doan
Vice President
Stanley Ereckson, Jr.
Vice President
Peter F. Doane
Secretary/Treasurer
Alan S. Binder
Assistant Secretary
James M. Strohan
Assistant Secretary
The VSR board adopted several resolutions during this meeting. The board approved the issuance *158 of 1,000 shares of VSR stock to VICORP for the subscription price of $ 1,010. The minutes of the meeting also reflect the following discussion: The Chairman then noted that VICORP Restaurants, Inc. (VRI) was negotiating with Foodmaker, Inc. (FMI) to purchase the assets of FMI's Continental Restaurant Systems Division (Assets) in accordance with the terms of the draft purchase agreement attached hereto and incorporated herein by reference as Exhibit "A" (Agreement). [9] It was further noted that in the event of the execution of the Agreement, VRI intended to place the Assets into the Corporation [VSR] and that the Corporation would operate the restaurants relating to those Assets itself or through its wholly owned subsidiaries. [10]
*159 The board authorized VSR's officers to borrow from VICORP an amount equal to the purchase price of the Foodmaker assets plus loan fees on the same terms and conditions given to VICORP under the Credit Agreement and to execute and deliver notes and all other documentation necessary to evidence this borrowing from VICORP. On February 13, 1984, the VICORP board of directors held a special meeting. The directors present in person at this meeting were Frederickson and Miles. Robert J. Donaldson, John C. Hoyt, and John W. Turner attended through a telephone converence call. The minutes of that meeting reflect that the board authorized and directed VICORP to enter into the Credit Agreement with the outside lenders, to borrow the amounts set forth under the provisions of the Credit Agreement, to execute promissory notes evidencing the borrowing, and to pledge the VSR stock to the outside lenders as required under the Credit AGreement. The VICORP board also authorized and directed VICORP to place the assets purchased from Foodmaker into VSR and its subsidiaries, to lend VSR the purchase price of the assets being transferred on the same terms and conditions as contained in the Credit *160 Agreement, and to accept from VSR a note evidencing the loan. [11]
*161 On February 17, 1984, pursuant to the Credit Agreement, the lenders' consortium lent an aggregate of $ 51.55 million to VICORP for the purchase of the Foodmaker assets. VICORP executed four separate term notes, one to each of the outside lenders, documenting the B Term Loan. On that same day, February 17, 1984, the Foodmaker assets were purchased and transferred directly to VSR and its subsidiaries. [12] Foodmaker received in consideration for its assets approximately $ 51,478,500 in cash, plus VSR's assumption of approximately $ 9.5 million of various liabilities of Foodmaker. During April of 1984, VICORP issued to the public its convertible subordinated debentures totaling $ 50 million, due on March 15, 2009 (the debentures). VICORP used the net proceeds from the debenture sale to pay off the outside lenders for the B Term Loan provided under the terms of the Credit Agreement. The debentures were unsecured *162 obligations of VICORP and bore interest at 13.5 percent, payable on March 15 and September 15 of each year until maturity, commencing September 15, 1984. The debentures were convertible into common stock of VICORP until maturity unless previously redeemed. VICORP's 1984 annual report to shareholders stated that VICORP's entrance into the specialty restaurant business was accomplished with the Foodmaker acquisition. The annual report further stated that the $ 66 million (sic) paid for the Foodmaker assets was equal to their net book value and that funding was principally provided by the issuance and sale of the VICORP debentures. VICORP's policy was to burden assets with all costs related to such assets and to aggressively match expenses with associated revenue. Thus, VICORP looked to VSR and the anticipated revenues from VSR's operation of the Foodmaker restaurants to fund the debt service on the debentures. VICORP expected that the cash generated from the operations of VSR would be adequate to service the payment requirements of the debentures. It was the understanding of Alan S. Binder (Binder), chief financial officer of VSR, and Rue Jenkins (Jenkins), director of financial *163 planning for VSR, that VSR was expected to pay all costs associated with the financing for the acquisition of the Foodmaker restaurants. VSR and VICORP kept separate books and records for accounting purposes. VSR recorded the cost of the Foodmaker assets on its books in an account entitled "Intercompany Payable (No. 2469)" (Account No. 2469) via an entry, dated February 15, 1984, described as "Original Purchase Price" in the amount of $ 51,478,500 (the original purchase price entry). On April 15, 1984, VSR directly paid to the outside lenders, on behalf of and on the instruction of VICORP, interest due from VICORP under the Credit Agreement in the amount of $ 738,845.24. This amount is reflected as a debit to Account No. 2469. VSR's internal accounting records show that VSR had paid-in capital in excess of par at September 30, 1984, of $ 1,000 and total shareholder's equity of $ 145,039.60. VSR's internal accounting records, dated October 28, 1984, show the original purchase price entry followed by the entry "Reclass to paid in capital". Similarly, VSR's internal accounting records for the period ended October 28, 1984, show a debit of Account No. 2469 in the amount of $ 51,478,500 *164 and a credit to the paid-in capital account (Account No. 3006) in the same amount. The explanation reflected in the journal entry is "Reclass VICORP Paid in Capital". Ron DeVos (DeVos), comptroller of VSR and head of the accounting department, prepared this entry, and Jenkins approved the reporting on VSR's internal accounting workpapers of the intercompany loan as paid-in capital. DeVos, as head of the accounting department, and Jenkins, as head of financial planning, were peers and worked closely together. It was not uncommon for DeVos to prepare significant accounting entries and present them to Jenkins for approval. Jenkins, however, would not have made an entry of this type or approved it without the knowledge of Binder, his immediate supervisor. [13] After discussions in the accounting department, this reclassification was undertaken so that the VSR balance sheet would look more attractive to outsiders. Binder as the chief financial officer of VSR approved this reclassification, either expressly or tacitly. See supra note 13. *165 After the reclassification of the intercompany advance to paid-in capital in October of 1984, VSR continued accruing interest expenses on the intercompany advance account because VICORP still owed interest to the debenture holders on the amount used to acquire the Foodmaker assets. Jenkins never received any notification from VICORP's headquarters in Denver, Colorado, to stop accruing these interest expenses on VSR's books and records. Other than the April 15, 1984, payment of interest made by VSR directly to the outside lenders, VSR did not pay any interest to VICORP or the debenture holders, and accrued the interest on its books. The interest obligations on the debentures were paid directly by VICORP. From its inception through its ultimate sale in 1986, VSR recorded entries described as "intercompany interest" in its internal accounting records. VSR's accounting workpapers for fiscal years 1984, 1985, and 1986 reflected entries of interest expense owed to third parties and entries described as intercompany interest due to VICORP on the acquisition price of the Foodmaker assets. These workpapers also showed that VSR calculated the amount of interest due to VICORP at a rate *166 of 13.5 percent. The workpapers for fiscal year 1984 reflected monthly intercompany interest computations based upon the balance in Account No. 2469. The workpapers for fiscal years 1985 and 1986, labeled "intercompany interest", contained entries described as VSR's cash advances to and from VICORP and interest booked by VSR. There was no reference to Account No. 2469, although the starting balance of these calculations for fiscal year 1985 approximately corresponded with the ending balance of Account No. 2469 for fiscal year 1984. VSR's accounting workpapers were not disseminated or published to the public. VSR recorded on its internal books and records an intercompany interest expense, in the total amount of $ 4,438,998.17, due to VICORP as of October 28, 1984, the close of its fiscal year. For its fiscal year ended October 27, 1985, VSR recorded a total interest expense of $ 5,741,325.53. For its fiscal year ended October 26, 1986, VSR recorded a total interest expense of $ 5,685,136.49. These amounts were calculated at 13.5 percent on the fluctuating balance due on the original purchase price of the Foodmaker restaurants. See infra note 15. These amounts do not include *167 any interest charge on other intercompany liabilities, such as management fees. [14]
VSR used Account No. 800537, titled "Interest Expense", to record the interest expense related to the acquisition of the Foodmaker assets for the period of March 18, 1984, through the first 11 months of the taxable year ended October 27, 1985. As of October 28, 1984, VICORP recorded as current account receivables on its internal accounting workpapers the monthly interest accrued by VSR from April through October of that year. During the twelfth month of that taxable year, the interest expense was recorded in Account No. 800538, titled "Intercompany Interest". For the next taxable year, ending October 26, 1986, VSR used Account No. 82364, titled "Intercompany *168 Interest -- VRI". [15]
The entire management team of Foodmaker joined VSR at the time of the acquisition and adopted the "dinnerhouse concept" being developed by VICORP. Some of these new corporate officers objected to interest expenses being charged to VSR by VICORP with respect to the acquisition cost of the Foodmaker restaurants. In initial discussions with the management of VICORP at the time of the Foodmaker acquisition, Binder expressed the view that he did not want the debt incurred by VICORP to fund the acquisition of Foodmaker to be recorded on VSR's books. Binder and the new VSR officers had been compensated, while *169 employed by Foodmaker, based on the company's economic performance at a time when Foodmaker did not have any significant interest expenses. They were concerned that the large interest expenses charged would diminish VSR's overall profitability and would decrease their individual compensation, which continued to be based upon the company's economic performance. The consolidated returns for the periods from February of 1984 through October 26, 1986, reflected deductions claimed on VSR's separate company income statements for accrued interest to VICORP. VICORP's separate company income statements did not reflect interest income corresponding to VSR's interest expense deductions; rather, VICORP reduced its own interest expense deductions by amounts equal to VSR's deductions for interest expense to VICORP. [16]
*170 VSR's separate company balance sheets that were part of VICORP's consolidated Federal income tax returns for the fiscal years ended 1984, 1985, and 1986 did not reflect a debt of $ 51.5 million due to VICORP. VICORP's separate company and consolidated balance sheets did not reflect a debt in the amount of $ 51.5 million due from VSR. Each of these balance sheets did, however, reflect paid-in capital to VSR in excess of $ 52 million. On its consolidated income tax returns for the fiscal years 1984, 1985, and 1986, in response to Question I(1) of Schedule J (which requires a listing of the highest amount owed -- including loans and accounts receivable/payable -- to or from a domestic corporation of which the filing corporation owns, directly or indirectly, 50 percent or more of the voting stock), VICORP did not list a loan due from VSR in the amount of $ 51.5 million, nor did the deemed sale return filed by VSR for October 27, 1986, reflect such a debt due to VICORP. VICORP and VSR did not publicly treat the original cost of the Foodmaker assets (the $ 51.5 million) as a loan to VSR. In documents submitted to or available to third parties, such as tax returns, annual reports to *171 shareholders, and filings with the Securities and Exchange Commission (SEC), VICORP and VSR treated the acquisition cost of the Foodmaker restaurants as a capital contribution rather than as loan from VICORP to VSR. Their treatment of intercompany interest was inconsistent but such interest was not specifically or publicly identified as interest on a loan to purchase the Foodmaker restaurants. The VICORP debentures were identified as the method of financing that acquisition. VSR Acquisition, Inc. (Acquisition) was a holding company formed by several of VICORP's former employees, including Miles, and other investors, for the purpose of purchasing the stock of VSR from VICORP. In a stock purchase agreement, dated September 18, 1986 (the Stock Purchase Agreement), VICORP agreed to sell all of its VSR stock to Acquisition under certain terms and conditions. Acquisition agreed to pay $ 81,000,000 in cash, 10,000 shares of Acquisition preferred stock, and two promissory notes totaling $ 7,485,431, representing the amount of an intercompany account owed by VSR to VICORP. Acquisition was not to assume any indebtedness of VSR to VICORP relating to the Foodmaker assets. The sale was *172 completed on November 24, 1986; however, VICORP and Acquisition elected to treat the sale as having occurred on October 27, 1986, to coincide with VICORP's fiscal year end. The purchase price Acquisition paid for the VSR stock was roughly twice the amount paid for the acquisition of the Foodmaker restaurants 3 years earlier. VICORP and Acquisition considered VSR's operating performance in evaluating and determining the purchase price of the VSR stock. They also considered VSR's claimed interest expense deductions with respect to the purchase price of the Foodmaker restaurants, which created most of VSR's claimed separate company net operating loss (NOL) for 1986, as making the VSR stock more valuable. VICORP calculated its gain on the sale of the VSR stock to Acquisition by including the $ 51.5 million purchase price of the Foodmaker assets in its basis in the stock of VSR. At the time of the sale of VSR's stock and using the proceeds of that sale, VICORP paid its obligations to the debenture holders and retired that debt. When Acquisition purchased the VSR stock, Acquisition did not assume any indebtedness relating to the original acquisition of the Foodmaker assets, nor did *173 VSR show any such indebtedness on its audited financial statements. In conjunction with but subsequent to VICORP's sale of VSR stock to Acquisition, VSR commissioned the preparation of audited separate company financial statements for the periods ended October 25, 1986, October 26, 1985, and the period from February 17, 1984 (its inception), through October 27, 1984. These financial statements were prepared by Coopers & Lybrand, certified public accountants, after the stock sale to Acquisition. Steve Hamm (Hamm), a partner in Coopers & Lybrand, supervised the preparation of and was responsible for certifying VSR's audited financial statements. Hamm prepared the balance sheet on what he characterized as a "going forward" basis to reflect the assets and liabilities that were going to be acquired and assumed by Acquisition in the purchase of VSR. VSR had not published any audited separate company financial statements prior to 1986, although Coopers & Lybrand had performed audits of VSR prior to 1986. Hamm explained that the audited separate company financial statements were prepared in 1986 on an historical basis with respect to cash flows of revenues and expenses and other financial *174 data of VSR. However, he conceded that those audited separate company financial statements were prepared on other than an historical basis with respect to debt and equity. What he considered as debt of VSR before the stock sale, he showed as equity after the sale. He did not consider the preparation of these statements in this manner to be misleading since VSR had not previously issued audited financial statements. Hamm understood that, historically, VSR was thinly capitalized and had debt of approximately $ 50 million. Thus, he thought that the reflection of interest expenses in the audited financial statements was consistent with his understanding. [17] However, the debt was not reflected on the balance sheets prepared by Coopers & Lybrand and is not consistent with Hamm's historical understanding of the company's initial structuring, because the debt was not being assumed by Acquisition. Acquisition obtained all of VSR's stock, and VSR had equity of over $ 52 million without any debt for the original acquisition of the Foodmaker assets. *175 Hamm treated the newly acquired equity of VSR by Acquisition, approximately $ 52.9 million, on these audited financial statements similar to something like a mandatorily redeemable preferred stock. Hamm explained that a non-SEC registrant would treat such an amount as equity but an SEC registrant with a first-time filing would have to treat it as debt. The financial statements reported that VSR had interest expense deductions in the amounts of $ 4,439,000 in fiscal year 1984, $ 5,569,000 in fiscal year 1985, and $ 5,682,000 in fiscal year 1986. The balance sheet contained in the audited financial statements shows that VSR had total shareholder's equity of $ 52,975,755 as of October 25, 1986. This balance sheet reflected liabilities and shareholder's equity as follows: FY 1986 FY 1985 FY 1984 Total current liabilities
$ 10,367,774
$ 12,831,061
$ 9,832,397
Due to VICORP and subsidiaries
15,353,770
6,579,939
-
Long-term debt
8,191,045
7,898,435
8,110,061
Capitalized lease obligations
4,193,478
4,436,578
4,703,956
Total liabilities
$ 38,106,067
$ 31,746,013
$ 22,646,414
Shareholder's equity:
Common stock, $ .01 par value
10
10
10
Additional paid-in capital
52,476,781
52,476,781
52,476,781
Retained earnings
498,964
4,555,915
2,500,950
Total shareholder's equity
$ 52,975,755
$ 57,032,706
$ 54,977,741
*176 Acquisition filed Federal income tax returns on a consolidated basis with VSR. Acquisition elected to treat the VSR stock purchase as an asset purchase under section 338. Acquisition's advisers concluded that, by making a section 338(a) election, VSR would obtain a stepped-up basis in its assets equal to their fair market values at the time of the stock sale. In addition, although this deemed sale would trigger capital gains taxable to VSR, the parties to the stock sale transaction contemplated that VSR's separate company NOLs (much of which was composed of VSR's claimed interest expenses) would offset much of that gain. Pursuant to this election under section 338, VSR filed a 1-day "deemed sale" corporate income tax return for the tax period beginning and ending on the sale date, October 27, 1986 (the deemed sale return). VSR reported on its deemed sale return a separate company NOL carryforward in the amount of $ 8,986,236, of which $ 5,685,136 represented the interest expense deduction claimed in fiscal year 1986. VSR used its separate company NOL to offset much of the gain it realized on the deemed sale of its assets. Respondent timely mailed a statutory notice of deficiency *177 to Green Leaf, formerly known as VSR, regarding the 1986 deemed sale return. Respondent disallowed $ 5,095,018 of VSR's NOL carryforward on the deemed sale return. Respondent based this on, among other things, disallowance of interest expense. OPINION Respondent disallowed VSR's claimed interest deduction for "interest due to VICORP" in the amount of $ 5,685,136 on the ground that the purchase price of the Foodmaker restaurants was a contribution to the capital of VSR. [18] *178 Respondent takes the position that the interest deduction claimed by VSR represents merely a cost allocation and was not based upon any actual debt owed by VSR to VICORP. [19] Respondent contends that VSR continued to accrue interest expense deductions on its separate company income statements merely for costkeeping purposes so as to follow the company policy of burdening assets with the costs associated with those assets. A deduction is allowed for all interest paid or accrued on indebtedness. Sec. 163(a). The interest must be paid or accrued on a bona fide debt arising from a true debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. However, "Interest calculated for costkeeping or other purposes on account of capital or surplus invested in the business which does not represent a charge arising under an interest-bearing obligation, is not an allowable deduction from gross income." Sec. 1.163-1(c), Income Tax Regs.
Respondent contends that Green Leaf bears the burden of proving that a bona fide debt obligation *179 existed between VSR and VICORP, from the time of the purchase of the Foodmaker assets to the time of the deemed sale transaction, and that Green Leaf has failed to establish that such an obligation existed. We agree. Green Leaf has presented only an agreement between VICORP and various outside lenders who provided the funds for the acquisition of the Foodmaker assets placed in VSR and the corporate minutes of VSR and VICORP relating to that acquisition. These documents refer to a potential loan to VSR of the funds being borrowed by VICORP, yet these documents do not establish that such a loan actually occurred. Miles testified that the outside lenders were not willing to lend the money directly to VSR due to concerns about fraudulent conveyances. See supra note 6. Yet, the evidence in the record does not show the trail of the movement of property and cash that resulted in VSR's ownership of the Foodmaker assets in February of 1984. VSR, a newly formed shell corporation with capital of $ 1,010, suddenly had assets worth over $ 51.5 million and assumed Foodmaker liabilities of some $ 9.5 million. No copy of the Agreement of Sale with Foodmaker is in evidence, and the record *180 does not even establish which corporation, VICORP or VSR, purchased the Foodmaker restaurants. See supra notes 8, 9, and 12. No copy of any loan agreement or even a promissory note between VICORP and VSR is in evidence, and the Court cannot find that any such document was ever executed. See supra note 11. Furthermore, under the criteria set forth in Hardman v. United States, 827 F.2d 1409 (9th Cir. 1987), in this case, the initial flow of funds for the Foodmaker assets themselves from VICORP to VSR resembles equity rather than debt. In Hardman the Court of Appeals for the Ninth Circuit, to which any appeal in this case would lie, set forth 11 factors to be used in evaluating a transfer to a corporation from a shareholder and in resolving whether it is debt or equity: (1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of other regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; *181 (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) ability to obtain loans from outside lending institutions. Hardman v. United States, 827 F.2d at 1412. Utilizing these factors, respondent contends that VSR's thin capitalization, the absence of a fixed payment schedule or maturity date, the doubtfulness of VICORP's ability to enforce repayment, and the lack of documentation memorializing the indebtedness support her determination that no bona fide loan has been established in this case. Petitioner also cites Hardman but asserts that an evaluation of its listed factors supports VSR's treatment of the intercompany advance as a bona fide debt. Petitioner asserts that, in this case, important business reasons required treatment of the advance as debt and that no improper motives entered into the consideration. The important business reasons presumably were the outside lenders' alleged requirement that the advance from VICORP to VSR be in the form of debt rather than a contribution to capital. However, the Court cannot find that the outside lenders imposed any such requirement. *182 See supra note 7. In addition, petitioner argues that, although all of the books and records, financial statements, and tax returns reflected that VICORP contributed equity to VSR, the intent of the parties is the most important factor to consider, and the intent was to create a bona fide debt obligation. Respondent relies heavily on the lack of any formal evidence of indebtedness and the consequential absence of security and dates certain for repayment of principal. We are mindful that a valid debt may exist between related parties without the formalities of a note, Byerlite Corp. v. Williams, 286 F.2d 285 (6th Cir. 1960); Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575 (1968), but in this instance we think that the totality of the attendant circumstances supports a finding of capital contribution. Our determination of the debt versus equity issue is governed by economic substance and reality rather than form. McSorley's, Inc. v. United States, 323 F.2d 900, 902 (10th Cir. 1963). Our decision is guided by a comparison and weighing of all of the factors generally regarded as the *183 differences between debt and equity. A. R. Lantz Co. v. United States, 424 F.2d 1330 (9th Cir. 1970); Fin Hay Realty Co. v. United States, 398 F.2d 694 (3d Cir. 1968). Corporate officers of VICORP and VSR testified that they intended the transfers to be loans and that repayment was expected. The Court did not find the vague, generalized, self-serving testimony of these corporate officials to be persuasive or helpful. [20] We must look beyond the subjective expressions of intent and determine whether objective manifestations support that subjective intent or a contrary conclusion. McSorley's, Inc. v. United States, supra.
*184 The objective factors in this case indicate no documentation of any debt, no fixed maturity date, no scheduled repayments of principal or interest, and any actual payments of funds to VICORP depending upon VSR's having excess funds available. Likewise, the evidence demonstrates inconsistent treatment by VSR of the intercompany advance and the purported interest expenses generated therefrom. Although the original purchase price entry of the Foodmaker assets was reclassified as paid-in capital, VSR's accounting workpapers continued to show computations of intercompany interest due to VICORP. The interest calculations for fiscal years 1985 and 1986 are based on the balance of Account No. 2469 even though the balance of that account had been debited and credited to the paid-in capital account in October of 1984. Green Leaf argues that respondent's position that VSR does not have a bona fide debt obligation to VICORP ignores contrary evidence. Green Leaf contends that VSR executed a promissory note and that, although petitioner was unable to locate the note or any copy of the note, the corporate minutes establish the loan, and the Credit Agreement required the loan. See supra *185 notes 11, 15. Green Leaf then contends that respondent fails to acknowledge that VSR's records are inconsistent and that VSR reported interest expense on the intercompany advance on every one of the same documents that respondent relies upon as showing the advance as equity. Green Leaf asks the question why would VSR meticulously calculate interest on the intercompany loan all of the years of its existence if the debt were not real. Green Leaf's answer is that it certainly was not to manufacture tax deductions because, in consolidated groups, such deductions "wash" with corresponding interest income, and no tax benefits are generated for either member of the group. Initially, we must address Green Leaf's veiled attempt to shift the burden of proof to respondent. Green Leaf argues that "respondent's position is fundamentally flawed because all of the documents on which it relies are internally inconsistent." The inconsistency of the documents placed in evidence is of Green Leaf's or VSR's own doing. As a result, such inconsistency is an obstacle that Green Leaf, not respondent, must overcome. The $ 51.5 million acquisition price of the Foodmaker assets and the interest payments *186 thereon were treated inconsistently on financial records as well as tax returns by VSR and VICORP. That, combined with the lack of formal documentation of any loan, makes it difficult for us to hold that Green Leaf has met its burden of sustaining its position. In Segel v. Commissioner, 89 T.C. 816 (1987), the taxpayers inconsistently treated certain payments, both as loans from shareholders and as capital contributions, on unaudited financial statements. In that case, we held that, under the objective test of Fin Hay Realty Co. v. United States, supra (16 factors similar to those in Hardman used to evaluate the true nature of an investment in a corporation), the payments constituted equity contributions because they were transferred under terms far more speculative than those an outside lender would require. In this case, although the outside lenders would not lend money to VSR directly, there are indications that the same terms and conditions governing the loan to VICORP were to apply to a relending of the funds to VSR. However, by April of 1984, VICORP had repaid the outside lenders, and by October of 1984, *187 VSR had recharacterized the intercompany advance as paid-in capital. It is at this point that the inconsistent treatment of the initial transfer of funds and of the interest expenses commenced. A rule that the original intention of the parties should control the character of an instrument for all time would be inconsistent with the objective factors approach of Hardman to debt-equity analysis. Interest, like an ordinary business expense, is allowed as a deduction from income because it is a cost of producing income. It ceases to be a real cost if with the passage of time it becomes apparent that the parties have no intention of continuing the debtor-creditor relationship. In this case, we have a situation where the continuation of a debtor-creditor relationship is in question. A parent's advance to a subsidiary may start out as bona fide indebtedness, and may continue for a time, but the character of indebtedness may vanish when the parent and the subsidiary cease acting like a debtor and a creditor. Frazier v. Commissioner, T.C. Memo. 1975-220. Assuming, for the sake of argument, that VSR and VICORP initially intended to establish a debtor-creditor *188 relationship on the same terms as those specified by the outside lenders, subsequent events reveal an intention to recharacterize the "intercompany loan account" as paid-in capital. First, officers of VSR were concerned about the effect of such debt and interest expenses on their compensation, which continued to be based upon the economic performance of the Foodmaker restaurants. Second, officers of both VSR and VICORP wanted VSR to appear attractive to outsiders. The classification of intercompany transfers as debt or equity and such interest payment accruals in a consolidated setting do not affect the affiliated group's tax liabilities; however, the appeal of a corporation with no debt but with NOL carryforwards to an outside purchaser, or in this case, a group of investors (including Miles) familiar with VSR and VICORP, cannot be overlooked in this case. Green Leaf argues that "it made absolutely no business sense for VICORP to put $ 50 million of equity into VSR, leaving VICORP liable for the $ 50 million debt to the outside lenders, without any secure means of paying the debt." We disagree, considering that the security for the B Term Loan was the stock of VSR, a company *189 holding assets worth in excess of $ 51.5 million. Green Leaf argues that VICORP's sale of VSR's stock to Acquisition could have been structured differently but that, despite the structure, the outcome remains the same. Green Leaf contends that, although VICORP and Acquisition agreed that Acquisition would not acquire VSR's intercompany debt to VICORP because VICORP would contribute that debt to VSR's capital immediately before the sale of VSR to Acquisition, [21] both companies understood and treated the intercompany debt as a bona fide interest-bearing obligation of VSR, which, on an historical basis, contributed to VSR's separate company NOLs. However, the Court concludes that the alleged debt had been a capital contribution from the original acquisition of the Foodmaker restaurants in 1984 or at least from October 1984 when the original purchase price was reclassified as paid-in capital. The separate company balance sheets of both VICORP and VSR that were part of their consolidated Federal tax returns in 1984, 1985, and 1986 always showed that VSR had paid-in capital of over $ 51.5 million and did not show any $ 51.5 million debt from VSR to VICORP. *190 We do not dispute that the substance of a transaction will govern over its form. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Gregory v. Helvering, 293 U.S. 465 (1935). Nevertheless, we rely upon the established principle that "a taxpayer is bound by what he did and he cannot prevail upon the basis of what he could have done but did not do." Island Gas, Inc. v. Commissioner, 30 T.C. 787, 795 (1958); see also Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). In this case, officers of VSR and VICORP wanted to match revenues with expenses, a policy that did not have tax consequences in the consolidated group setting. However, they also wanted to maintain their levels of compensation as well as to present a healthy balance sheet to outsiders. Thus, a decision was made to recharacterize the original purchase price of the Foodmaker assets as paid-in capital of VSR. VICORP calculated its gain on the sale of the VSR stock by including the purchase price of the Foodmaker assets in its basis in the stock of VSR. VSR's *191 audited financial statements for the taxable years 1984, 1985, and 1986, prepared after the VSR stock sale, showed paid-in capital of over $ 52 million. This was consistent with what had been shown on the separate company balance sheets filed with the consolidated Federal tax returns for those years. Green Leaf cannot now disavow these decisions because it does not like or did not expect the resultant tax consequences. Furthermore, we agree with respondent's determination that the interest payments accrued by VSR merely represented interest calculated for costkeeping purposes. Prior to VICORP's refinancing, VSR made an interest payment directly to the outside lenders. When the B Term Loan from the outside lenders was satisfied and VICORP's interest obligation to the debenture holders became fixed, VSR continued to accrue intercompany interest on its internal accounting records, but it never paid any interest to VICORP. Furthermore, the Form 10-Q filed with the SEC for the quarter ended July 22, 1984, states that VICORP "believes that the cash generated from the operations of VSR will be adequate to service the payment requirements of the debentures". These statements support *192 respondent's contention that VICORP's obligation to pay interest first to the outside lenders and then to the debenture holders was allocated to VSR in an effort to burden assets with the costs associated with those assets or to match expenses with the associated revenue. The interest payments accrued by VSR seem less tied to an obligation running between VSR and VICORP than dependent upon VICORP's obligations to third parties. Also in VICORP's annual report to shareholders and in its SEC filings, VICORP never mentioned the existence of any $ 51.5 million debt between VICORP and VSR. Although Green Leaf's analysis that no tax benefits were generated by the interest expense deductions is correct in the consolidated group setting, it explains only part of the situation. Such deductions constituted part of VSR's separate company NOLs. Such losses coupled with VSR's reclassification of debt as equity explain why VSR would be attractive to potential third party purchasers. Acquisition was attempting to purchase NOL carryforwards without any underlying debt. However, VSR's reclassification of debt as equity to improve its balance sheets, both before and after the stock sale, shows *193 that its accrual of interest expenses on its internal accounting records was simply for cost-allocating purposes. Generally, consolidated taxable income takes into account the separate taxable income of each member of a consolidated group. Sec. 1.1502-11(a)(1), Income Tax Regs. The taxable income of each member of the group is computed in accordance with the provisions of the Internal Revenue Code covering the determination of taxable income of separate corporations. Sec. 1.1502-12, Income Tax Regs. Payments of interest or for services rendered by one member to another member of the group are "intercompany transactions" as defined in section 1.1502-13(a)(1), Income Tax Regs. Gains or losses on intercompany transactions usually are taken into account by the members of the group in the computation of taxable income: such gains and losses are not deferred or eliminated. Sec. 1.1502-13(b)(1), Income Tax Regs.
Thus, if VSR had an interest-bearing obligation owing to VICORP during the taxable year 1986, it would have been proper for VSR to claim the interest payment due on the obligation as a deduction from its separate company taxable income and for VICORP to include the interest *194 payment received (or accrued) in its separate company taxable income. However, VICORP did not include in income the interest payments accrued by VSR but reduced its own interest deductions. Most telling in this case is the fact that neither VICORP's annual report to its shareholders nor any of the documents filed by VICORP with the SEC or the Internal Revenue Service (IRS) discloses or even suggests that VSR had a $ 51.5 million debt obligation to VICORP. Considering all of the objective factors present in the record, we conclude that there was no bona fide debt obligation between VSR and VICORP during the taxable year ended October 26, 1986, to support the NOL carryforward relating to the interest expense deduction for that year. Thus, we sustain respondent's determination with respect to this debt/equity issue. Applicability of Section 482
Alternatively, Green Leaf relies upon section 1.482-2A(b), Income Tax Regs., to support its position that it is entitled to the claimed interest expense deduction. [22]Section 1.482-2A(b), Income Tax Regs., provides that, where one member of a group of controlled entities performs services for the benefit of, or on behalf of, another *195 member of the group without charge, or at a charge which is not equal to an arm's-length charge, the District Director may make appropriate allocations to reflect an arm's-length charge for such services. Furthermore, section 1.482-1A(b)(3), Income Tax Regs., states that section 482 does not grant any rights to a controlled taxpayer to apply its provisions or to compel the District Director to apply those provisions. Thus, a taxpayer may not affirmatively use section 482; only the IRS may invoke the provisions of section 482 and the regulations promulgated thereunder. Foster v. Commissioner, 80 T.C. 34, 191 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985) (full discussion of this aspect of section 482 and its predecessor).
*196 If the IRS does invoke section 482 as authority for a proposed allocation of an arm's-length charge to a controlled entity as consideration for services received from another controlled entity, the controlled entity paying the charge may argue that its payment must be respected by the IRS under the authority of section 1.482-2A(b)(6), Income Tax Regs. Section 1.482-2A(b)(6), Income Tax Regs., provides that, where an arm's-length charge for services has been determined with reference to costs or deductions and a member has allocated such costs or deductions to reflect arm's-length charges by employing a consistent method of allocation that is reasonable and in keeping with sound accounting practices, such method will not be disturbed. Thus, this section acts as a "safe harbor" provision for a taxpayer to assert as a defense to a proposed allocation by the IRS under section 1.482-2A(b)(1), Income Tax Regs.
Green Leaf argues that it may invoke section 1.482-2A(b)(6), Income Tax Regs., as an alternative basis for deducting the claimed interest expenses even though respondent has not proposed an allocation under section 1.482-2A(b)(1), Income Tax Regs. As noted above, respondent has *197 not invoked and is not relying on section 482 for the determined adjustment in this case. Rather, respondent relies upon well-established principles that distinguish debt from equity. Therefore, petitioner cannot invoke the safe harbor provisions of section 1.482-2A(b)(6), Income Tax Regs.
Respondent further argues that, even if Green Leaf were able to invoke section 1.482-2A(b)(6), Income Tax Regs., Green Leaf has not met its burden under that section. Respondent contends that Green Leaf has not offered any evidence to support its position that VICORP's costs or deductions for the services it performed for VSR included the amount of interest VSR accrued on the intercompany advance. Respondent argues that such amount in fact cannot be included in any costs or deductions of VICORP but actually constitute distributions from VSR to VICORP with respect to its stock (i.e., dividends to the extent of earnings and profits). We need not address this argument since we agree with respondent's initial position that Green Leaf cannot invoke the provisions of section 482. Based upon the concessions and the foregoing holdings, *198 Decision will be entered under Rule 155. Footnotes
1. The parties have stipulated that the cost-of-goods-sold deduction reflected on the separate company income statement of VICORP Specialty Restaurants, Inc., filed with the consolidated income tax return of VICORP Restaurants, Inc., for TYE Oct. 26, 1986, is allowable in the amount of $ 158,068,044 in lieu of $ 157,729,965 as originally claimed on said return. In the notice of deficiency, respondent disallowed a portion of the net operating loss (NOL) deduction relating to depreciation or amortization of goodwill and other intangibles and a portion of the NOL deduction relating to bonus payments under a deferred payment plan. Respondent also determined that the taxable income reported on the 1-day deemed sale return was understated by virtue of the failure to recognize ordinary income from the recapture gain from the sale of smallwares. Green Leaf Ventures, Inc., (Green Leaf) has conceded these adjustments. The parties have also resolved the accrued medical expense deduction issue.↩
2. Green Leaf contends, in the alternative, that it should be entitled to deduct the $ 5,685,136 as a charge allocated to it by its parent corporation under sec. 1.482-2T(b), Temporary Income Tax Regs., 58 Fed. Reg. 5282 (Jan. 21, 1993), for the costs the parent incurred specifically for its benefit. See infra↩ note 22.
3. The name of VICORP Specialty Restaurants, Inc. (VSR) was later changed to Paragon Restaurant Group, Inc., and then to Green Leaf Ventures, Inc. In certain exhibits, the names "VSR" and "VSR Division" appear and are used nterchangeably. Both names refer to VICORP Specialty Restaurants, Inc.↩
4. In certain exhibits, VICORP Restaurants, Inc., (VICORP) is referred to as VRI, and the names are used interchangeably.↩
5. Those lenders were United Bank of Denver, N.A., Omaha National Bank, Merrill Lynch Interfunding, Inc., and the lead lender, Continental Illinois National Bank and Trust Company of Chicago. VICORP had a previously established debtor-creditor relationship with these lenders.↩
6. Although the outside lenders initiated the idea of forming VSR, VICORP's board of directors was enthusiastic about having a subsidiary own and operate the Foodmaker restaurants. They thought that the formation of VSR would not only serve the lenders' needs but also would serve VICORP's own business purposes, such as insulating VICORP's corporate assets from potential State law liabilities for serving alcoholic beverages to patrons at Foodmaker restaurants. The Foodmaker restaurants represented VICORP's first entry into the alcoholic beverage end of the restaurant business. There was concern about liabilities beyond insurance coverage. In addition, Gordon H. Miles (Miles), chairman of the board of directors of VICORP, did not question the terms of the Credit Agreement or discuss alternatives because he did not see any difference between a loan to VICORP and a relending to VSR or a direct loan by the outside lenders to VSR. Based on the lending officers' comments, Miles was under the impression that a direct loan from the outside lenders to VSR without going through VICORP could be characterized as a fraudulent conveyance. At that point VSR was essentially a shell corporation without any capital or other assets.↩
7. Petitioner argues that the outside lenders "required" VICORP to provide the money to VSR as debt as opposed to providing it to VSR as a capital contribution. We cannot find that the outside lenders imposed such a requirement. Also it seems illogical that they would have done so. The lenders took a lien on and a security interest in 100 percent of the VSR stock to secure the $ 51.5 million loan to VICORP; it seems unlikely that the lenders would then subordinate their security interest to a debt between VICORP and VSR for the $ 51.5 million used to acquire the Foodmaker assets. Moreover, VICORP's 1984 annual report to shareholders discloses that later in 1984, after the outside lenders had been paid off, the VSR stock was again pledged as security for a $ 15 million revolving line of credit.↩
8. The record in this case does not contain a copy of any Agreement of Sale executed between Foodmaker and either VICORP or VSR. The "Agreement of Sale" identified in the Credit Agreement was one between Foodmaker, Inc., and VICORP. Therefore, it is not clear which corporation, VICORP or VSR, actually made the purchase of the foodmaker assets.↩
9. Again, this agreement of sale between Foodmaker and VICORP or VSR was not attached to the copy of the minutes of the board meeting introduced into evidence. See supra↩ note 8.
10. The VSR board authorized the purchase of 100 percent of the capital stock of two of VICORP's wholly owned subsidiaries, VICORP of Wisconsin, Inc., and Villa Inns of Wisconsin, Inc. There is no indication as to whether, and, if so, how VSR financed such acquisitions.↩
11. No note evidencing the purported loan from VICORP to VSR for the purchase of the Foodmaker assets has been located or offered into evidence. Miles testified that there was such a note but that he does not recall who signed it. When asked how he knows that there was a note, Miles testified that there were a lot of documents being dealt with at the time and that all of the steps required by the loan documents were taken. He recalled that it was a note purchased from a stationery store, "just a plain old promissory note with a little Indian head on it." Miles made a request to Dan Bylund, Green Leaf's current chief financial officer, to search the records maintained by VSR in San Diego and to VICORP to search its records. Charles R. Frederickson, president of VICORP and of VSR, testified that he believes that a note was prepared but he has no specific recollection of it. Peter F. Doane, executive vice president and chief financial officer of VICORP, does not recall seeing a note, but he would not say that one was not executed. He asked VICORP to search for the note, but it could not be found. Alan S. Binder, chief financial officer of VSR, does not recall having seen a note from VSR to VICORP. Petitioner has not established that any such note was ever executed.↩
12. The record does not establish which corporation, VICORP or VSR, actually made the Foodmaker purchase.↩
13. Jenkins, as director of financial planning, was primarily responsible for budgeting and comparing actual results to the budgets, working on projects for Binder, the chief financial officer of VSR, and managing the daily cash position of the company. Binder testified that his concern was determining an "operating profit line", before interest and taxes, to evaluate the company's performance. He did not recall whether there was interest being charged on the intercompany advance or other debts or the magnitude and size of those charges. He focused on the costs of running the business on a day-to-day basis before considering how VSR would fund interest or any other expenses that came below that operating profit line. He did not consider any interest being accrued on VSR's books payable to VICORP as an operating expense. Binder did not recall interest accruals on the intercompany advance nor did he recall authorizing a reclassification of the advance as paid-in capital.↩
14. VICORP provided VSR with administrative services for which it charged a management fee. On its consolidated tax returns, VICORP reported the management fees paid by VSR as income to VICORP, with a corresponding deduction for the accrual of those fees as an expense deduction of VSR.↩
15. Account No. 82364 showed the calculation of interest on the funds to purchase the Foodmaker assets, net of cash draws by VICORP or cash advances to VSR. When VSR had excess cash, that cash was transferred to its parent, and the VSR accounting department treated it as a principal payment on the original advance, reduced the account balance by the cash advance, and then calculated interest.↩
16. The parties stipulate that, consequently, respondent's disallowance of VSR's deduction of interest, if sustained, would result in a corresponding increase in VICORP's interest deduction for fiscal year 1986.↩
17. When asked directly whether VICORP had advanced approximately $ 50 million to VSR in early 1984, Hamm characterized the transaction as follows: My understanding in 1984 was that VICORP leveraged the acquisition of VSR with outside third parties for approximately $ 52 million. That $ 52-million debt was meant to be repaid by -- through the operations of VSR on an ongoing basis.↩
18. Respondent did not examine the consolidated income tax returns filed by VICORP and its subsidiaries, including VSR, for TYE Oct. 28, 1984, and Oct. 27, 1985. Consequently, respondent made no adjustment to that portion of the NOL carryforward deduction on petitioner's deemed sale return that relates to the 1984 or 1985 taxable years. The notice of deficiency disallows only the deduction of intercompany interest claimed by VSR for TYE Oct. 26, 1986. Respondent does not concede that VSR's deductions of intercompany interest claimed in the consolidated returns for TYE Oct. 28, 1984, and Oct. 27, 1985, were proper.↩
19. Respondent's determination would not have resulted in any increase in tax to the VICORP consolidated group had VSR remained a part of the group. However, with VSR's departure, the disallowance of the portion of VSR's NOL relating to the "interest due to VICORP" deduction results in a comparable increase to the interest deduction allowable to VSR's former parent corporation, VICORP, and a tax deficiency for VSR. See supra↩ note 16.
20. That is particularly true as to Miles, who was on both sides of the VICORP-VSR dealings at the time of the acquisition of the Foodmaker restaurants in 1984 and also at the time of Acquisition's purchase of the VSR stock in 1986. Miles appeared willing to characterize the transactions in inconsistent ways to suit his purposes at any given time. His testimony must be contrasted with the annual reports to shareholders, SEC filings, Federal tax returns, and VSR's audited financial statements.↩
21. We note that there is no evidence in the record to suggest that VICORP intended to contribute any $ 51.5 million debt to VSR's capital immediately before the sale of the VSR stock.↩
22. Petitioner cites sec. 1.482-2T(b), Temporary Income Tax Regs., 58 Fed. Reg. 5282 (Jan. 21, 1993), rather than sec. 1.482-2A(b), Income Tax Regs.Sec. 1.482-2T(b), Temporary Income Tax Regs.↩, was not effective until Apr. 21, 1993, and does not apply retroactively. Nevertheless, the language of both sections is the same.